Theresa K. FULLER, Appellant,

v.

IOWA DEPARTMENT OF HUMAN
SERVICES, Appellee.

No. 96–1272.

Supreme Court of Iowa.

March 25, 1998.

Earl A. Payson, Davenport, for appellant.

Thomas J. Miller, Attorney General, and Barbara E.B. Galloway, Assistant Attorney General, for appellee.

Considered by McGIVERIN, C.J., and HARRIS, LAVORATO, NEUMAN, and TERNUS, JJ.

McGIVERIN, Chief Justice.

In this case, the controlling issue is whether the district court properly dismissed plaintiff-employee's disability discrimination petition based on its finding that plaintiff was not permanently disabled.

We affirm.

## I. Background facts.

Plaintiff, Theresa K. Fuller, began working for the Iowa Department of Human Services (hereinafter "DHS" or "Department"), Scott County office, in October 1975. In her position as an income maintenance worker, Fuller was responsible for determining correct welfare benefits, including ADC, Food Stamps and Medicaid for clients. Part of her job duties included maintaining two files for her clients, including a hard-copy paper file and information in the computer. The hard-copy paper files for active cases were stored in each individual employee's office.

During July 1992, Fuller fell behind in completing her files. The DHS provided Fuller with additional time to work on the backlog, but she still had difficulty completing the files. On one of Fuller's days off from work, her supervisor inventoried the files in Fuller's office and found that seven files assigned to Fuller were not in her office.

On August 21, 1992, plaintiff began receiving treatment from a psychiatrist, Dr. Joseph M. Bertroche, who diagnosed her condition as depression. Fuller has experienced depressive episodes in the past. In late 1975, Fuller was hospitalized for depression. In 1989, Fuller was taken to a hospital emergency room after pouring gasoline over herself. In relation to that incident, Fuller began seeing a psychologist for treatment for depression. Her family doctor prescribed Prozac, an antidepressant for two to three months.

In September 1992, Fuller took a leave of absence from work pursuant to Dr. Bertroche's recommendation. Fuller was hospitalized that month for approximately one week to ten days. During her absence, Fuller's cases were distributed to other employees. The DHS ultimately determined that eighty-three of 192 cases assigned to Fuller could not be located within the office. A search was conducted and some of the files were found, but sixty-seven files remained missing. Those files were never found and the DHS had to reconstruct the files which required contacting clients to obtain the necessary information and some signatures.

On November 3, DHS regional administrator Dennis Timmerman wrote to Dr. Bertroche concerning Fuller's ability to perform her job responsibilities. Dr. Bertroche responded with a letter dated November 18, stating that Fuller had been diagnosed as having a major affective disorder, that she had been hospitalized and was being treated for depression, and that she was unable to perform her job responsibilities.

On December 2, Timmerman wrote to Dr. Bertroche for his opinion concerning Fuller's "ability to handle an inquiry on a work-related situation which has the potential to have serious ramifications regarding her employment." The "potentially serious situation" was the subject of the missing files. Timmerman received no response from Dr. Bertroche, but later received a letter on December 21 from William Bribriesco, Fuller's brother and an attorney, stating that he was representing Fuller and that Dr. Bertroche was unsure whether Fuller was medically capable of handling an inquiry on a work-related situation.

Timmerman wrote to Bribriesco on December 30, stating that any discussion concerning the missing files would occur when Fuller was medically released to return to work.

On February 27, 1993, Dr. Bertroche released Fuller to return to work on March 1, 1993, with the condition that she work part-time.

On March 10, the DHS held a meeting with Fuller to discuss the missing files. The meeting lasted approximately twenty minutes. DHS employees present at the meeting included Timmerman and others. Fuller was present along with her husband Kirk Fuller, also a DHS employee, and her brother, Bribriesco.

During the meeting, Timmerman informed Fuller that the DHS believed Fuller might possibly have information that would help them locate the missing files. After Timmerman reviewed this information, Bribriesco interrupted the meeting, stating that he would advise Fuller not to respond to any of the Department's concerns and also requested that Timmerman put into writing the demands for information regarding the sixty-seven missing files. Timmerman agreed this would be done and a brief recess was held. After the recess, however, Bribriesco indicated he would allow Timmerman to ask Fuller a couple of questions. Timmerman asked Fuller whether she had any knowledge regarding the missing case records, and Fuller responded she had no such knowledge. Timmerman then asked Fuller whether she had any information about the records at home, and Fuller answered "no." The meeting ended after Bribriesco stated that he would file a workers' compensation claim if Fuller had a relapse or another depressive episode.

On March 15, Timmerman wrote to Dr. Bertroche requesting an additional statement concerning Fuller's ability to work and stating that the DHS still had to address the "potentially serious situation" with her. Timmerman did not receive any response from Dr. Bertroche. However, Fuller was released to return to work full-time, without any restrictions, on March 17.

Timmerman still had received no response from Dr. Bertroche after one month. On April 20, Timmerman told Fuller that another investigatory meeting about the missing files was scheduled for April 22. Timmerman told Fuller that Bribriesco would not be allowed to participate at the next meeting, but that she would be allowed to have union representation.[1]

The next day, Timmerman received a letter from Dr. Bertroche stating that he had seen Fuller in his office that day and that he was not aware of the nature of the "potentially serious situation." In his letter, Dr. Ber-

---

1. Fuller was a member of the Iowa United Professionals union. As part of her union membership, Fuller had the right to have a union representative present during the investigatory meeting scheduled for April 22, 1993. This right is known as the *"Weingarten* right." *See National Labor Relations Bd. v. J. Weingarten, Inc.,* 420 U.S. 251, 95 S.Ct. 959, 43 L.Ed.2d 171 (1975). An employee's right to union representation during the investigatory process does not include the right to have a private attorney or a co-worker present. Nothing in the trial record shows that Fuller informed the DHS after March 10, 1993, that she would invoke her right to have union representation at the April 22 meeting.

troche also for the first time imposed a restriction upon Fuller's release to work full-time, stating that although Fuller was able to handle her normal work activities, she needed the support of a family member when the DHS discussed the "potentially serious situation" with her.

On that same day, Bribriesco sent a letter to Timmerman that threatened legal action and demanded that the meeting be postponed until Fuller was medically capable of handling a discussion regarding the "potentially serious situation," or that he be allowed to attend the meeting scheduled for April 22.

The meeting was postponed, and the DHS placed Fuller on sick leave until it received further clarification from Dr. Bertroche regarding her ability to handle job responsibilities.

In late August 1993, plaintiff requested a ninety-day medical leave without pay which the DHS approved.

Timmerman informed Fuller by letter dated December 3, that her leave period expired on November 29. Fuller responded by requesting reinstatement to her position, again requesting the accommodation of having a family member present during any investigation regarding the previous allegations, and alternatively requesting a ninety-day leave without pay.

In a letter dated December 9, 1993, the DHS rejected Fuller's requested leave and advised her that she would be removed from the DHS payroll effective that date. The letter explained that her request for medical leave of absence was denied because her "position had been nonproductive since September 4, 1992."

## II. Background proceedings.

On April 11, 1994, plaintiff filed an administrative complaint with the Iowa Civil Rights Commission (ICRC), pursuant to Iowa Code section 216.15 (1993), alleging discrimination in employment based on race, color and national origin, sex, mental disability and retaliation. The ICRC issued a right-to-sue letter and plaintiff later filed a petition in district court against defendant DHS alleging a disability discrimination claim.

A bench trial in this law action was held. At trial, Dr. Bertroche testified that plaintiff still suffers from depression and will continue to do so throughout her life. Dr. Bertroche testified that in his opinion, plaintiff's mental condition "was biological in nature and exacerbated by work-related stressors." He explained that between August 21, 1992, to February 27, 1993, Fuller "had severely deteriorated activities of daily life, and was severely depressed and anxious." Dr. Bertroche also testified that as of February 27, 1993, Fuller's depression did not affect her ability to care for herself or to work and that she responded well to medications.

The Department's expert witness, Dr. Taylor, testified that by April 1993, Fuller "was not impaired." He also found no evidence that Fuller's depressive condition adversely affected a major life activity as of April 1993. Dr. Taylor further testified that Fuller might have depressive episodes in the future but that her depression would respond to Prozac.

The district court entered judgment in favor of the defendant DHS and dismissed plaintiff's petition. The district court determined that plaintiff was not permanently disabled because her depression could be controlled with medication and while on medication, her depression did not substantially impact any of her major life activities. The court further determined that Fuller's request to have a family member present during meetings with supervisors was not a reasonable accommodation because the DHS was not required to remove all stress from Fuller's work duties. The court also found that there was no reasonable accommodation that would enable plaintiff to meet with supervisors to discuss the missing files. Because Fuller could not perform an essential job function—meet with supervisors—and because there was no reasonable accommodation that the DHS could give her, the court also concluded that plaintiff was no longer a qualified employee under Iowa Code chapter 216. The court concluded that plaintiff failed to prove her disability discrimination claim.

On her appeal, plaintiff Fuller contends that the district court erred in: (1) consider-

ing the mitigating effects of medication on her ability to control her depression; (2) finding that she was no longer a qualified employee because there was no reasonable accommodation that would allow her to continue her job; and (3) placing the burden of proof on her to request a specific reasonable accommodation.

### III. Standard of review.

On appeal, we review disability discrimination claims tried to the court for errors of law. Iowa R.App. P. 4; *Cole v. Staff Temps,* 554 N.W.2d 699, 702 (Iowa 1996). In reviewing such cases, we are bound by the district court's findings of fact if they are supported by substantial evidence. Iowa R.App. P. 14(f)(3). "Evidence is substantial when a reasonable mind would accept it as adequate to reach a conclusion." *Cole,* 554 N.W.2d at 702. When considering whether evidence is substantial, we view it in the light most favorable to upholding the district court's judgment. *Frunzar v. Allied Property & Cas. Ins. Co.,* 548 N.W.2d 880, 884–85 (Iowa 1996). In doing so, we are not bound by the district court's application of legal principles or conclusions of law. *Cole,* 554 N.W.2d at 702.

### IV. Elements and proof model of an ADA claim.

The parties dispute the underlying reasons for Fuller's termination. The DHS contends "it never acknowledged that it relied upon Ms. Fuller's alleged disability" in deciding to remove her from the payroll. Fuller, on the other hand, contends that the Department's employment decision was based on her alleged disability, her depressive condition.

■ In cases where the parties dispute the reason for the adverse employment decision, a plaintiff may use the burden-shifting framework identified in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817,

36 L.Ed.2d 668 (1973), to prove discriminatory motive. *Cole,* 554 N.W.2d at 703 (defendants asserted they refused to hire plaintiff because of chronic absenteeism, not because of plaintiff's fibromyalgia or back injury); *cf. Boelman v. Manson State Bank,* 522 N.W.2d 73, 79 (Iowa 1994) (burden-shifting framework not necessary where employer admits adverse employment decision was based on plaintiff's disability).[2] Under this proof model, a plaintiff must

> establish her ability to prove a prima facie case. In the absence of an explanation from the employer, this creates a rebuttable presumption of discrimination. The burden of production then shifts to the employer to come forward with a legitimate, nondiscriminatory reason for its actions. Finally, the burden shifts back to the plaintiff to prove that the defendant's proffered reason is pretextual and that intentional discrimination was the true reason for the defendant's actions.

*Cole,* 554 N.W.2d at 703 (quoting *Price v. S–B Power Tool,* 75 F.3d 362, 365 (8th Cir.1996) (summary judgment appropriate where plaintiff presented no facts showing she was terminated because of epilepsy; employer offered legitimate nondiscriminatory reason for her dismissal and employee failed to come forward with any evidence of pretext)). At all times, however, the plaintiff retains the burden of persuading the trier of fact that she has been the victim of illegal discrimination based on disability. *Id.*

■ To prove a prima facie case of disability discrimination, a plaintiff must show that she: (1) has a disability; (2) is qualified to perform the essential functions of the job with or without a reasonable accommodation; and (3) has suffered an adverse employment action under circumstances from which an inference of unlawful discrimination arises. *Id.* Whether a person has a disability is determined on a case-by-case basis. *Bear-*

---

**2.** The analysis we established in *Boelman* is similar to the analytical framework in *Cole,* in that both require a plaintiff to prove he or she was (1) disabled; (2) qualified; and (3) suffered adverse employment decision because of a disability. The only difference with the analytical approach followed in this case, and in *Cole,* is that once the plaintiff proves a prima facie case of disability discrimination, [elements 1–3], then the burden shifts to the employer to prove a nondiscriminatory reason for the adverse employment decision. The burden then shifts back to the plaintiff to prove that the employer's reason is pretextual and that the real reason for the employment action was intentional discrimination based on disability. *See Cole,* 554 N.W.2d at 703.

*shield v. John Morrell & Co.,* 570 N.W.2d 915, 918 (Iowa 1997).

### V. Analysis of Fuller's disability claim.

Plaintiff brings her disability discrimination claim under the Iowa Civil Rights Act (hereinafter "ICRA"), chapter 216 of the Iowa Code. Iowa Code section 216.6(1)(a) (1995) is Iowa's counterpart to the Americans with Disability Act (hereinafter "ADA"), the federal law that prohibits discrimination in employment based on disability. *See* 42 U.S.C. § 12112(a) (1994). Like the ADA, Iowa law states that it is an unfair or discriminatory employment practice to refuse to hire an applicant or to discharge an employee because of a disability. *See* Iowa Code § 216.6(1)(a).

In considering a disability discrimination claim brought under Iowa Code chapter 216, we look to the ADA and cases interpreting its language. *Bearshield,* 570 N.W.2d at 918. We also consider the underlying federal regulations established by the Equal Employment Opportunity Commission (hereinafter "EEOC"), the agency responsible for enforcing the ADA.[3] *Id.* Cases interpreting the Rehabilitation Act, *see* 29 U.S.C. §§ 701–797(b) (1994), also remain instructive, since the ADA's definition of "disability" is substantially the same as that term is defined in the Rehabilitation Act. *See Bearshield,* 570 N.W.2d at 918 (comparing 29 U.S.C. § 706(8)(B) with 42 U.S.C. § 12102(2)).

Under the ADA, a "disability" is defined as follows:

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment.

42 U.S.C. § 12102(2). The term "disability" is similarly defined under Iowa law as "the physical or mental condition of a person which constitutes a substantial handicap." Iowa Code § 216.2(5).[4] The regulations promulgated pursuant to Iowa Code chapter 216 expand on this definition:

The term "substantially handicapped person" shall mean any person who has a physical or mental impairment which substantially limits one or more major life activities, has a record of such an impairment, or is regarded as having such an impairment.

Iowa Admin. Code r. 161–8.26(1) (1993).

Although the ADA does not define the terms "physical or mental impairment," "substantially limits," or "major life activities," we are guided by the definitions provided in the EEOC regulations issued to implement the ADA. *Cole,* 554 N.W.2d at 703.

Here, Fuller contends that her depression/anxiety disorder meets the first definition of disability, that is, that her depression constitutes a mental impairment that substantially limits a major life activity.[5]

### A. "Mental Impairment."

A "physical or mental impairment" refers to any physiological disorder or condition, affecting one or more of the body systems, or any mental or psychological disorder. 29 C.F.R. § 1630.2(h); *see also* Iowa Admin. Code r. 161–8.26(2). An "impairment" "does not include characteristic predisposition to illness or disease." 29 C.F.R. § 1630, app. § 1630.2(h).

---

3. These regulations are found at 29 C.F.R. § 1630. In conjunction with implementing regulations under the ADA, the EEOC has also issued an Interpretive Guidance "to ensure that qualified individuals with disabilities understand their rights under this part and to facilitate and encourage compliance by covered entities." 29 C.F.R. § 1630, app. Introduction. This Interpretive Guidance appears in an appendix following the regulations. The Interpretive Guidance "represents the Commission's interpretation" of issues concerning the ADA and underlying regulations. *See id.*

4. The 1996 amendment to Iowa Code section 216.2(5) substituted "disability" for "handicap." *See* 1996 Iowa Acts ch. 1129, § 113.

5. Plaintiff does not contend that she "has a record of such impairment," or that the DHS "regarded her as having such an impairment." We thus need not consider whether plaintiff qualifies as disabled under these definitions.

Plaintiff's condition was diagnosed as anxiety/depressive disorder which would continue throughout her life. Dr. Bertroche testified that her mental condition is biological in nature and is exacerbated by work-related stressors. Dr. Taylor also testified that Fuller's depressive disorders "are caused by a genetically-determined or inherited biochemical difference in her central nervous system." The district court considered this testimony to mean that Fuller had a physical predisposition to depression. The DHS thus contends that her depression cannot qualify as a mental impairment.

■ The rule seems well-established from decided cases, however, that depression and other psychological disorders qualify as a "mental impairment" under the ADA. *See Sarko v. Penn–Del Directory Co.,* 968 F.Supp. 1026, 1035 (E.D.Pa.1997) (depression constitutes mental impairment under ADA but plaintiff failed to show depression substantially limited major life activity of working); *accord Soileau v. Guilford of Maine, Inc.,* 105 F.3d 12, 15 (1st Cir.1997) (chronic depressive disorder qualified as impairment but plaintiff failed to show condition substantially limited a major life activity); *Bultemeyer v. Fort Wayne Community Sch.,* 100 F.3d 1281, 1284 (7th Cir.1996) (plaintiff's past and continuing battle with bipolar disorder and paranoid schizophrenia qualified as disability under ADA); *Pesterfield v. Tennessee Valley Auth.,* 941 F.2d 437, 441 (6th Cir.1991) (plaintiff with depression was "qualified handicapped person" under Rehabilitation Act, and "handicap" substantially limited his ability to work, but plaintiff was not capable of performing the essential functions of his job and there was no reasonable available accommodation which would have permitted him to perform essential functions of his job).

■ We therefore conclude that plaintiff's depressive condition qualifies as a "mental impairment" under the ICRA for purposes of a disability discrimination claim, irrespective of the testimony presented at trial concerning Fuller's predisposition to depressive episodes.

B. "Substantially limits a major life activity."

■ Although plaintiff's depressive disorder qualifies as a mental impairment, plaintiff must still prove that this mental impairment substantially limits a major life activity. *Cole,* 554 N.W.2d at 704.

"Major life activities" include "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i); *see also* Iowa Admin. Code r. 161–8.26(3). This list is not intended to be exhaustive. *See* 29 C.F.R. § 1630, app. § 1630.2(i). A disability substantially limits a person's major life activity if the person is

(i) Unable to perform a major life activity that the average person in the general population can perform; or

(ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

*Bearshield,* 570 N.W.2d at 919 (quoting 29 C.F.R. § 1630.2(j)(1)). The following factors should be considered in determining whether an impairment substantially limits a major life activity:

(1) the nature and severity of the impairment;

(2) the duration or expected duration of the impairment; and

(3) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment.

29 C.F.R. § 1630.2(j).

Here, the district court concluded that plaintiff's depressive condition did not substantially impact a major life activity because it could be controlled with medications. The court stated:

The issue is also raised as to whether Plaintiff's disability is permanent. Testimony of both psychiatric witnesses indicates that while Plaintiff is on medications, her depression does not substantially impact any of her major life areas. The evidence in this case was clear that while

upon her medications, after February 27, 1993, Plaintiff was not permanently disabled.

This Court cannot find that Plaintiff's depression, as controlled by her medications, disabled her to the extent that her employer was required to restructure her job so as to change the fundamental requirements of the job to protect her from inherent stressors in the workplace....

Fuller points out that the EEOC's Interpretive Guidance states that the mitigating effects of medication should not be considered in determining whether a person has an impairment, or whether that impairment substantially limits a major life activity. Fuller thus contends the district court erred in considering the mitigating effects that her medication has on her ability to control her depression.

The DHS contends that even if the district court should not have considered Fuller's medicated state, that substantial evidence exists in the record to support the district court's finding that Fuller's depression did not substantially limit a major life activity and that Fuller thus failed to prove the first element of a prima facie case of discrimination based on disability. The DHS also contends that although Fuller's depression affected her personal life in the past, she presented no evidence that she was unable to care for herself after she returned to work in March 1993.

Thus, the fighting issue in this case is whether, and to what extent, the mitigating effects of medication and other assistive devices may be considered in analyzing a disability discrimination claim. This is an issue of first impression for us.

 As Fuller points out, the EEOC's Interpretive Guidance concerning the mitigating effects of medication on an impairment provides in pertinent part:

The *existence of an impairment* is to be determined without regard to mitigating measures such as medicines, or assistive devices or prosthetic devices.... For example, an individual with epilepsy would be considered to have an impairment even if the symptoms of the disorder were completely controlled by medicine. Similarly, an individual with hearing loss would be considered to have an impairment even if the condition were correctable through the use of a hearing aid.

29 C.F.R. § 1630, app. § 1630.2(h) para. 2 (emphasis added). The Interpretive Guidance also states:

The determination of whether an individual is *substantially limited in a major life activity* must be made on a case by case basis, without regard to mitigating measures such as medicines, or assistive or prosthetic devices.

29 C.F.R. § 1630, app. § 1630.2(j) para. 7 (emphasis added). The EEOC's guidance is not a binding regulation, but simply the agency's interpretation of the statute. *See, e.g., Coghlan v. H.J. Heinz Co.*, 851 F.Supp. 808, 812 (N.D.Tex.1994). Although agency interpretations are given deference, *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694, 704 (1984), agency interpretations are not entitled to deference if they are in direct conflict with the statutory language. *Schluter v. Industrial Coils, Inc.*, 928 F.Supp. 1437, 1445 (W.D.Wis. 1996).

Courts which have considered this issue have reached different results. Some courts have adopted the EEOC's Interpretive Guidance,[6] while others have expressly or implicitly rejected the EEOC's guidance on the basis that the EEOC's interpretation directly conflicts with the ADA's statutory requirement that the impairment be substantially limiting.[7]

---

[6]. *See Hendler v. Intelecom USA, Inc.*, 963 F.Supp. 200, 206 (E.D.N.Y.1997); *Wilson v. Pennsylvania State Police Dep't*, 964 F.Supp. 898, 903–04 (E.D.Pa.1997); *Sicard v. City of Sioux City*, 950 F.Supp. 1420, 1438 (N.D.Iowa 1996). *See also* Peggy R. Mastroianni and Carol R. Miaskoff, *Coverage of Psychiatric Disorders Under the Americans with Disabilities Act*, 42 Vill. L.Rev. 723,

733–37 (1997) (advocating that "substantial limitation should be assessed without regard to mitigating measures, including medications that control symptoms of the underlying impairment").

[7]. *See Sutton*, 130 F.3d at 901 n. 8 (and cases cited therein).

In *Sutton v. United Air Lines, Inc.*, 130 F.3d 893 (10th Cir.1997), the Tenth Circuit Court of Appeals held that the mitigating effects of medications and corrective measures should be considered in determining whether a person's mental or physical impairment substantially limits a major life activity. In this case, two commercial airline pilots sued an airline for disability discrimination in hiring based on the airline's requirement that pilots have uncorrected vision of 20/100 or better in each eye. Plaintiffs could not meet this standard without correction and were therefore disqualified from pilot positions with United Air Lines. Plaintiffs contended they were disabled under the ADA because their uncorrected vision substantially limited their major life activity of seeing and that the airline's policy discriminated against them based on their disability.

The district court granted the airline's motion to dismiss. The district court concluded plaintiffs were not disabled within the meaning of the ADA, because even though they had a physical impairment, plaintiffs were not substantially limited in the major life activity of seeing with the aid of corrective measures.

On appeal, plaintiffs argued that the district court erred in considering their vision impairment, with the benefit of corrective measures, contrary to the EEOC's Interpretive Guidance. The Tenth Circuit Court of Appeals affirmed the district court's ruling that plaintiffs failed to prove that their physical impairment, their vision, substantially limited a major life activity. In reaching this conclusion, the court first noted its adoption of the EEOC's Interpretive Guidance stating that the "existence of an impairment is to be determined without regard to mitigating measures such as medicines, . . . ." *Sutton*, 130 F.3d at 899 (citing 29 C.F.R. § 1630, app. § 1630.2(h) para. 2). The court stated:

We will evaluate Plaintiffs' vision in the uncorrected state, without the benefit of mitigating or corrective measures, because the EEOC's Interpretive Guidance is reasonable and consistent with the statutory mandates themselves. The fact that a disorder or condition may be mitigated or correctable does not affect the underlying nature of the disorder or condition. If the underlying disorder or condition makes worse or diminishes in a material respect any of the enumerated body systems of the individual, then it should be considered an "impairment," regardless of whether the individual compensates for this worsening or diminishment by corrective measures.

*Id.* (citing *Roth v. Lutheran Gen. Hosp.*, 57 F.3d 1446, 1454 (7th Cir.1995)).

However, as to whether plaintiffs' visual impairment substantially limited a major life activity, the court rejected the EEOC's Interpretive Guidance that this determination should be made without regard to medications or corrective measures. *Id.* at 902. The court concluded that this portion of the Interpretive Guidance was "in direct conflict with the plain language of the ADA." *Id.* In other words, under the EEOC's interpretation, a person who can perform a major life activity with corrective measures—and who is therefore not "limited"—would nevertheless satisfy the "substantially limited" requirement, even though the statute clearly requires substantial limitation. The court also stated that "[i]n making disability determinations, we are concerned with whether the impairment affects the individual in fact, not whether it would hypothetically affect the individual without the use of corrective measures." *Id.*

One court has described the situation as follows:

If an insulin-dependent diabetic can control her condition with the use of insulin or a near-sighted person can correct her vision with eyeglasses or contact lenses, she cannot argue that her life is substantially limited by her condition. To say that a person who needs insulin or eyeglasses is disabled in fact is to read out of the act's first definition of disability the requirement that it applies only to those persons who are "substantially limited" in major life activities.

*Schluter*, 928 F.Supp. at 1445 (stating EEOC's interpretation directly conflicts with statutory language requiring plaintiff to show impairment substantially limits a major life activity).

The court in *Sutton* also noted that the EEOC's position concerning the effect of medications is inconsistent with other statements regarding the "substantially limits" requirement. *Sutton*, 130 F.3d at 902. For instance, the Interpretive Guidance states that "[m]any impairments do not impact an individual's life to the degree that they constitute disabling impairments. An impairment rises to the level of disability if the impairment substantially limits one or more of the individual's major life activities." 29 C.F.R. § 1630, app. § 1630.2(j) para. 2. The Interpretive Guidance further states that the determination of whether a person has a disability is based "on the effect of that impairment on the life of the individual." *Id.* The court concluded that this language was inconsistent with the EEOC's comment that mitigating measures should not be considered when determining whether an impairment substantially limits a major life activity. *Sutton*, 130 F.3d at 903.

The court thus determined that with their corrected vision, plaintiffs were not limited in their normal daily activities and in fact could "function identically to individuals without a similar impairment." *Id.*

We believe that the reasoning of the court in *Sutton* reflects a common-sense approach to analyzing whether an impairment substantially limits a major life activity. To conclude otherwise would in effect allow plaintiffs to bypass the substantially limiting requirement. This result would also directly conflict with the ADA's statutory requirement that a disability-discrimination-plaintiff prove his or her impairment substantially limits a major life activity. Fuller cannot have it both ways. For example, without medication, Fuller's depression would substantially limit her ability to work or to care for herself, in which case she would not be able to perform the essential functions of her job and thus would not be qualified for her position. Conversely, with the assistance of medication, Fuller's depression does not substantially limit her ability to work or to care for herself, and thus she is not disabled.

We thus hold that in a disability discrimination case, a fact finder *may not consider* the mitigating effects of medication or assistive devices in determining *the existence of an impairment*, but that the mitigating effects of medication or other assistive devices *may be considered* in determining whether *the impairment substantially limits a major life activity.*[8]

In summary, we conclude that it was proper for the district court to consider the mitigating effects that medication had on Fuller's mental impairment.

Fuller's main contention focuses on whether the district court correctly applied the law in considering whether her depression was substantially limiting, rather than on whether the district court's finding on this issue is supported by substantial evidence. However, we are satisfied that the district court's finding, that Fuller's mental impairment does not substantially limit a major life activity, is supported by substantial evidence. Fuller does not contend that her depressive condition substantially limits a major life activity when she is taking medication. We note that two psychiatrists testified that Fuller's depression could be controlled with medication at which time her depression would not adversely affect her major life activities.

*VI. Disposition.*

With respect to whether plaintiff's mental impairment substantially limited a major life activity, we conclude the district court correctly applied the law and properly considered the mitigating effects that medication has on plaintiff's ability to control her depressive condition. Fuller failed to prove that her depression substantially limits a major life activity and thus failed to meet the definition of a disability under Iowa Code section 216.2(5) (defining disability as a "physical or mental condition of a person which constitutes a substantial disability").

---

8. In establishing this rule, we note that a plaintiff can still prove his or her impairment substantially limits a major life condition, even when considering the mitigating effects that medication has on the plaintiff's ability to control the impairment. *See, e.g., Coghlan,* 851 F.Supp. at 814 (plaintiff presented sufficient evidence to generate a genuine issue of material fact as to whether plaintiff's diabetes substantially limited a major life activity even when controlled by insulin).

As a result, under this record, Fuller failed to satisfy the first element of a prima facie case of a disability discrimination claim.[9] We therefore need not consider other issues raised in the appeal.

Accordingly, we affirm the district court's ruling entering judgment in favor of the defendant DHS.

**AFFIRMED.**

---

**9.** As a result, the burden never shifted to the DHS to prove a nondiscriminatory reason. *See Cole,* 554 N.W.2d at 706 (plaintiff fails to prove prima facie case of disability discrimination where evidence is deficient on one or more elements).