Rusty **VINCENT**, Appellant,

v.

**FOUR M PAPER CORPORATION,**
Appellee.

No. 96–234.

Supreme Court of Iowa.

Feb. 17, 1999.

Terry D. Loeschen and John M. Loeschen of Loeschen & Loeschen, Burlington, and Robert N. Johnson III of Saunders, Humphrey & Johnson,. Fort Madison, for appellant.

Kelly R. Baier and Melissa Weets Anderson of Bradley & Riley, P.C., Cedar Rapids, for appellee.

Considered by CARTER, P.J., and LAVORATO, NEUMAN, SNELL, and CADY, JJ.

SNELL, Justice.

Plaintiff appeals from district court judgment entered for defendant following nonjury trial on his claim of disability discrimination under the Iowa Civil Rights Act. We find no error in the district court judgment and therefore affirm.

### I. Factual and Procedural Background

Plaintiff Rusty Vincent began working at Consolidated Packaging Corporation (CPC), a paper mill in Fort Madison, in 1974. By 1981 he had been promoted to the position of machine tender, the highest paying production job at the mill. In the summer of 1993 the mill was inundated by flood waters of the Mississippi River, which caused significant damage. CPC suspended operations and closed the plant for repairs. Most employees, including Vincent, were laid off. During the layoff, on August 15, 1993, Vincent suffered a ruptured brain aneurysm, resulting in an intra-cranial hemorrhage. He underwent successful surgery on August 31, 1993, to relieve the hemorrhage and repair the damage to his brain. Dr. Matthew Howard, Vincent's surgeon, discharged Vincent from the hospital on September 23, 1993. Vincent was given a prescription for phenobarbital, an anti-seizure medication which can cause drowsiness and affect balance. Dr. Howard advised Vincent he would not issue him a medical release to return to work until six months had passed.

On September 27, 1993, CPC recalled some employees from layoff status, including Vincent, to operate the mill on a limited basis. Vincent did not return to work at that time as he had not yet received a medical release. Vincent's position as machine tender was filled by another employee. Dennis O'Brien, CPC's director of human resources, changed Vincent's status from laid-off to medical leave to enable Vincent to receive weekly medical benefit payments.

In October 1993, Vincent visited CPC offices and met with O'Brien to discuss his condition. Vincent told O'Brien about the six-month recuperation period required by his doctor before he would be able to return to work. O'Brien noted that Vincent spoke more slowly than prior to his illness and had a limp. Vincent told O'Brien that he was experiencing trouble with his speech, weakness and problems with his leg falling asleep.

In early December 1993, Four M Paper Corporation (Four M) announced its intent to offer to purchase the assets of CPC. On December 7, 1993, O'Brien distributed a letter to all CPC employees informing them of the upcoming sale and its effect on their positions. The letter informed the employees that if they wished to work for Four M after the sale, they must return completed application forms by December 13, 1993. When Vincent received the letter, he visited Dr. Howard and asked to receive a medical release to resume work. Vincent and Dr. Howard did not discuss the job requirements of his position as machine tender. Nevertheless, Dr. Howard wrote Vincent a note which stated that Vincent "is now medically released to resume work. If he has difficulty with his work load this release will be reassessed."

On December 10, 1993, Vincent visited the mill with the release from Dr. Howard and declared himself available to work. When O'Brien heard about the release, he instructed the plant supervisor not to allow Vincent to resume work until O'Brien had seen him. O'Brien testified that based on their October meeting he believed Vincent would not be able to resume work for approximately two

more months and he was concerned about his safety.

On December 13, 1993, O'Brien called Dr. Howard about the medical release and voiced his concerns. O'Brien described the job requirements of the machine tender position,[1] and inquired as to whether Dr. Howard believed Vincent would be able to work in such a physically demanding position without posing a danger to himself or others. Dr. Howard replied that at the time he wrote the release he was unaware of the nature of Vincent's job. Vincent met with O'Brien later that day and phoned Dr. Howard, who explained he intended to rescind the medical release based on this new information about Vincent's position. Vincent informed O'Brien that the release had been rescinded and resumed his medical leave status. At that time, Vincent did not request any sort of accommodation to enable him to return to his position as machine tender; nor did he request to be placed in a less dangerous and physically demanding position.

In late December 1993, contract negotiations occurred between Four M and the workers' union. The terms of the contract provided that Four M would hire all currently working CPC employees and would rehire all CPC employees still on layoff status. With regard to CPC employees currently on medical leave, the terms required Four M to give those employees first consideration for employment as a new hire once the employee showed Four M an unrestricted medical release. Regarding seniority, the contract provided that employees currently working for CPC on January 5 would have a date of hire for seniority purposes of January 6. Former CPC employees on layoff status on January 5 would have a date of hire of January 7 for seniority purposes. For all other hires, including those returning from medical leave, the date of hire for seniority purposes would be their first working day.

Following the completion of negotiations and ratification of the contract but before Four M assumed operation of the mill, Vincent called Bill Smith, the plant manager. He asked Smith whether he could start work on January 6 to save his seniority status if he could obtain a medical release from his doctor before that time. Smith allegedly replied that Vincent could not yet return to work because he was "too sick to work." Vincent then requested that he be placed in any position "to save my 19 years of seniority" and Smith replied there was nothing the company could do.

The purchase of CPC by Four M was completed on January 6, 1994. Vincent was not hired at that time, but continued on medical leave. On February 22, 1994, Dr. Howard gave Vincent an unrestricted medical release. On March 2, 1994, Four M hired Vincent as a member of the labor pool. His position as machine tender had been filled. Vincent's position paid $11.20 per hour, in contrast to the machine tender rate of $14.52 per hour. In addition, his seniority status was below that of most other Four M employees despite his nearly twenty years of working at the mill.

On July 5, 1994, Vincent filed a claim against Four M with the Iowa Civil Rights Commission (ICRC), alleging disability discrimination. On October 10, 1994, the ICRC issued an administrative closure notice, see Iowa Admin. Code r. 161–3.12(2)(a), (3), indicating there was "insufficient information to warrant further investigation and that further processing would not indicate that [Four M's] reasons are a pretense for discrimination." On June 26, 1995, the ICRC issued Vincent an administrative release or right-to-sue letter. See Iowa Code § 216.16 (1993); Iowa Admin. Code r. 161–3.10(1), (3).

On September 22, 1995, Vincent filed a petition in district court against Four M alleging discrimination in employment based on a disability in violation of the Iowa Civil Rights Act (ICRA).[2] See Iowa Code § 216.6.

1. The machine tender oversees the operation of a large paper machine that forms and dries the pulp to make paper. The job entails, among other responsibilities, traversing ladders and catwalks on or near the machine several times per day to supervise the production process. The machine is open and contains numerous fast-moving parts. A number of accidents have occurred on the machine, involving broken and severed limbs and, in one case, death.

2. In an amended petition, Vincent also asserted claims under the federal Americans with Disabil-

Vincent sought damages for back pay and reimbursement of out-of-pocket expenses for medication and counseling necessitated by the emotional distress he suffered as a result of his employment situation. He also sought either reinstatement to his old position or front pay, and reinstatement of his seniority status. Following a bench trial, the court entered judgment in favor of Four M. Vincent appeals.

## II. Issues on Appeal

Vincent contends the district court erred in concluding he was not disabled or regarded as disabled by Four M. He also argues that Four M's policy requiring a medical release or that the employee be 100% healed before he or she may resume work is a per se violation of the ICRA.[3] He further maintains the district court failed to conduct an individualized inquiry with regard to his claim that a reasonable accommodation could have been made to enable him to resume his job prior to his medical release.

Four M responds that Vincent's temporary inability to work near dangerous machinery is not a disability within the meaning of the ICRA because it did not substantially impair any major life activity. Four M also maintains Vincent's accommodation argument should be rejected because he did not request an accommodation at any time. Finally, Four M argues Vincent's claim that the provision in the collective bargaining agreement on hiring those on medical leave is a per se violation of the ICRA is without merit. It asserts that the provision does not refer to disability, but only made employment with Four M on the day of the takeover and seniority status dependent upon availability for work. Alternatively, Four M suggests Vincent lacks standing to challenge the al-

leged per se violation because he is not disabled.

## III. Scope of Review

■■■ Our review of a disability discrimination claim tried to the court is for the correction of errors of law. Iowa R.App. P. 4; *Fuller v. Iowa Dep't of Human Servs.*, 576 N.W.2d 324, 328 (Iowa 1998); *Boelman v. Manson State Bank*, 522 N.W.2d 73, 76 (Iowa 1994). We are bound by the trial court's findings of fact if they are supported by substantial evidence. Iowa R.App. P. 14(f)(1). "Evidence is substantial when a reasonable mind would accept it as adequate to reach a conclusion." *Fuller*, 576 N.W.2d at 328 (citation omitted). We view the evidence in the light most favorable to upholding the judgment. *Id.; Boelman*, 522 N.W.2d at 76. We are not bound by the district court's application of legal principles or conclusions of law. *Fuller*, 576 N.W.2d at 328.

## IV. General Legal Principles

Iowa Code section 216.6, part of the Iowa Civil Rights Act, governs unfair employment practices. The law provides:

1. It shall be an unfair or discriminatory practice for any:

a. Person to refuse to hire ... or to otherwise discriminate in employment against any applicant for employment or any employee because of the ... disability of such applicant or employee, unless based on the nature of the occupation.

Iowa Code § 216.6(1)(a).

In our prior cases involving claims of disability discrimination, we have recognized the common purposes of the federal Americans with Disabilities Act (ADA), *see* 42 U.S.C. § 12101 et seq. (1994), and the ICRA as well

___

ities Act (ADA). *See* 42 U.S.C. § 12101 et seq. (1994). At the commencement of trial, the court granted Vincent permission to again amend his petition to delete the claims asserted under the ADA.

**3.** The issue of whether a "100% healed" policy violates the ICRA was also raised in *Bearshield v. John Morrell & Co.*, 570 N.W.2d 915 (Iowa 1997). We declined to consider the issue in that case because the plaintiff had not filed a cross-motion for summary judgment alleging that she

was entitled to judgment as a matter of law on that ground. We considered only whether the defendant had satisfied the standard for summary judgment. *Bearshield*, 570 N.W.2d at 923 n. 3. The United States District Court for the Northern District of Iowa has stated in dicta that a 100% healed policy is a violation of the Americans with Disabilities Act. *See Hutchinson v. United Parcel Serv., Inc.*, 883 F.Supp. 379, 396 (N.D.Iowa 1995).

as the similarity in terminology of the statutes. *Bearshield v. John Morrell & Co.*, 570 N.W.2d 915, 918 (Iowa 1997). Moreover, we have looked to the ADA and federal regulations implementing that act in developing standards under the ICRA for disability discrimination claims. *See id; see also Probasco v. Iowa Civil Rights Comm'n*, 420 N.W.2d 432, 435–36 (Iowa 1988) (noting similarity in federal and state statutes and regulations governing disability discrimination and incorporating federal definitions of relevant terms into Iowa law).

In *Boelman*, we held that in cases in which the employer acknowledges reliance on a disability-related reason for the employment decision, the plaintiff must prove that he or she "(1) has a disability; (2) was qualified for the position; and (3) was discharged because of his or her disability."[4] *Boelman*, 522 N.W.2d at 79. Because this case does not involve discharge of an employee, we alter the last element to require Vincent to prove that Four M refused to hire him on January 6, 1994, along with the other CPC employees because of his disability or because it regarded him as having a disability.

### V. Analysis of Vincent's Claim

The threshold question under the *Boelman* analysis is whether Vincent established by a preponderance of the evidence that he was disabled within the meaning of the ICRA. *Id.; see Falczynski v. Amoco Oil Co.*, 533 N.W.2d 226, 234 (Iowa 1995) ("If the court finds plaintiff was not disabled, the court, as fact finder, need go no further."). Whether a person has a disability is determined on a case-by-case basis. *Bearshield*, 570 N.W.2d at 918.

The ICRA defines "disability" as "the physical or mental condition of a person which constitutes a substantial handicap." Iowa Code § 216.2(5).[5] The administrative rules provide further guidance on what constitutes a disability:

> The term "substantially handicapped person" shall mean any person who has a physical or mental impairment which substantially limits one or more major life activities, has a record of such an impairment, or is regarded as having such an impairment.

> The term "physical or mental impairment" means:

> a. Any psychological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological; musculoskeletal; special sense organs; respiratory, including speech organs; cardiovascular; reproductive; digestive; genito-urinary; hemic and lymphatic; skin; and endocrine. . . .

> . . . .

> The term "major life activities" means functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.

Iowa Admin. Code rs. 161–8.26(1)–(3).

Four M does not contest that at the time of the employment decisions at issue in this case, Vincent's physical condition constituted a physical impairment under the ICRA. Therefore, we are only concerned with determining whether the district court properly concluded that Vincent's physical impairment did not "substantially limit[ ] one or more major life activities" and that Four M did not "regard[ ][him] as having such an impairment." *Id.* r. 161–8.26(1).

---

**4.** In *Boelman*, we noted that other courts had altered the *McDonnell Douglas* prima facie case requirement normally used to prove a discriminatory motive for cases in which the employer acknowledges reliance on the employee's disability in its employment decision. *Boelman*, 522 N.W.2d at 79 (citing *Teahan v. Metro–North Commuter R.R.*, 951 F.2d 511, 515–16 (2d Cir.1991); *Doe v. New York Univ.*, 666 F.2d 761, 776 (2d Cir.1981); *Pushkin v. Regents of Univ. of Colorado*, 658 F.2d 1372, 1385–86 (10th Cir.1981); *Brand v. Florida Power Corp.*, 633 So.2d 504, 509 (Fla.Dist.Ct.App.1994)); *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Those courts replaced or modified the *McDonnell Douglas* analysis with the analysis outlined above, specifically designed for disability discrimination claims.

**5.** In 1996, the General Assembly amended Iowa Code section 216.2(5) to substitute "disability" for handicap. *See* 1996 Iowa Acts ch. 1129, § 113(2).

A. Whether Vincent's Impairment Substantially Limited the Major Life Activity of Working to Constitute a Disability Under the ICRA

■■■ Our prior cases provide us with helpful guidelines for interpreting our statutes and regulations in determining whether a person suffers from a disability. A disability substantially limits a major life activity if the person is

"(i) Unable to perform a major life activity that the average person in the general population can perform; or

(ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity."

*Bearshield,* 570 N.W.2d at 919 (quoting 29 C.F.R. § 1630.2(j)(1)). The following factors should be considered in making this assessment: " '(i) The nature and severity of the impairment; (ii) The duration or expected duration of the impairment; and (iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment.' " *Id.* (quoting 29 C.F.R. § 1630.2(j)(2)).

In *Bearshield,* we noted that

[a] person is substantially limited in his or her ability to work when the person is "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities."

*Id.* at 920 (quoting 29 C.F.R. § 1630.2(j)(3)(i)). We further noted that " '[t]he inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.' " *Id.* (quoting 29 C.F.R. § 1630.2(j)(3)(i)).

In *Probasco,* we noted that "the phrase 'substantially limits' must be interpreted to mean the degree to which the impairment affects an individual's employability." *Probasco,* 420 N.W.2d at 436. We set forth the following factors to be considered in this calculus:

The degree to which an impairment substantially limits an individual's employment potential must be determined with reference to a number of factors: the number and type of jobs from which the impaired individual is disqualified, the geographical area to which the individual has reasonable access, and the individual's job training, experience and expectations.

*Id.; accord Bearshield,* 570 N.W.2d at 920 (listing similar factors) (quoting 29 C.F.R. § 1630.2(j)(3)(ii)). We further noted in *Probasco:*

An impairment that interferes with an individual's ability to do a particular job but does not significantly decrease that individual's ability to obtain satisfactory employment otherwise is not substantially limiting within our statute.

*Id.* We have rejected any implication from our holding in *Probasco,* however, "that one must be almost unemployable because of one's impairment to be considered disabled." *Henkel Corp. v. Iowa Civil Rights Comm'n,* 471 N.W.2d 806, 810 (Iowa 1991).

Based on these standards and the evidence adduced at trial, we agree with the district court's conclusion that Vincent was not substantially limited in the major life activity of working because his "physical condition was not so debilitating that he would have been prevented from obtaining other satisfactory employment (i.e. jobs not requiring driving a vehicle or working around dangerous machinery)."

At the time Four M refused to return Vincent to his position as machine tender, he was only halfway through a six-month recuperation period following a major surgical procedure. Although Vincent did initially receive a medical release to return to work in December 1993, that release was obtained without his physician knowing what physical requirements his job entailed. Once informed of those requirements, Vincent's physician promptly rescinded the medical release. Following his telephone conversation with Dr. Howard, Vincent told O'Brien that Howard was concerned about him being around heavy equipment and moving machinery.

When we examine the factors set forth in *Bearshield* and *Probasco,* we find substantial

evidence exists to support the district court's conclusion that Vincent was not substantially limited in the major life activity of working. Testimony at trial supports the district court's conclusion that Vincent was prohibited by his physician from working on or around heavy equipment and dangerous machinery. While this did preclude Vincent from working at his former position of machine tender, this rather narrow limitation did not significantly curtail Vincent's ability to obtain other employment not involving heavy equipment or dangerous machinery. *Cf. Probasco,* 420 N.W.2d at 436 (concluding fact that plaintiff's condition rendered it inadvisable that she work around particular set of environmental circumstances, particularly intense chemical fumes, dust and poor ventilation, was insufficient to qualify her as a disabled person); *see also Hollinrake v. Iowa Law Enforcement Academy,* 452 N.W.2d 598, 604 (Iowa 1990) (finding plaintiff who suffered from poor vision was not disabled under the ICRA because he was not disqualified from a wide range of other available jobs, but only restricted from jobs requiring stringent visual acuity).

The number and type of jobs from which Vincent was disqualified because of his impairment was fairly limited. In addition, Vincent failed to present substantial evidence that his impairment precluded him from performing a class of jobs or a broad range of jobs in various classes as required to establish the existence of a substantial limitation on his ability to work. Moreover, Vincent's condition, although serious, was only temporary and not expected to have a long term impact on his work capabilities.

We find the district court's conclusion that Vincent's impairment did not constitute a disability because it did not substantially limit him in the major life activity of working is supported by substantial evidence.

B. Whether the Evidence Supports the District Court's Conclusion that Four M Did Not Regard Vincent as Being Disabled

■ As an alternative argument, Vincent asserts that even if his physical impairment

did not render him disabled within the meaning of the ICRA, Four M still violated the Act's provisions because it regarded him as having an impairment which substantially limited him in the major life activity of working. *See* Iowa Admin. Code r. 161-8.26(1). The term "is regarded as having an impairment" is defined as follows:

a. Has a physical or mental impairment that does not substantially limit major life activities but that is perceived as constituting such a limitation;

b. Has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or

c. Has none of the impairments defined to be "physical or mental impairments," but is perceived as having such an impairment.

*Id.* r. 161-8.26(5).

■ The purpose behind recognizing "perceived disability" claims is that "[i]nclusion of such claims under our civil rights act prevents adverse employment consequences based upon prejudices, ignorance, and stereotypes regardless of whether the individual has an actual physical or mental disability." *Howell v. Merritt Co.,* 585 N.W.2d 278, 281 (Iowa 1998) (footnote omitted) (clarifying acceptance of perceived disability doctrine).

In considering the perceived disability doctrine, we have restricted its use to those cases in which the adverse employment decision "rested on myths, fears, or stereotypes," the type of conduct which the ICRA was intended to remedy. *See id.* In *Howell,* the defendant terminated the plaintiff from her position as a house cleaner after only 12.5 hours of work. The plaintiff alleged the defendant discharged her the day after she wore a TENS unit[6] to work. According to the plaintiff, the defendant listed the following reasons for her discharge: "(a) her back condition would prevent her from doing her

---

**6.** "A TENS unit is a battery-operated medical device used to alleviate chronic back spasms and

headaches." *Howell,* 585 N.W.2d at 279.

job; (b) her back condition was too much of a liability for the company; and (c) the company's customers would be embarrassed to have [plaintiff] work in their homes with a TENS unit." *Id.* at 279. In reviewing the district court's grant of summary judgment for the defendant, we concluded a reasonable fact finder could determine that the defendant's decision to discharge the plaintiff "was based in part on a perception of disability associated with her use of the TENS device." *Id.* at 281. We found "[t]hat justification does suggest a reliance on stereotypes rather than an ad hoc evaluation of [plaintiff's] physical condition." *Id.*

In *Annear v. State,* 454 N.W.2d 869 (Iowa 1990), we also considered the concept of perceived disability under the ICRA. In *Annear,* the plaintiff alleged the defendant terminated his employment and refused to rehire him following his recovery in violation of the ICRA's disability discrimination provisions. The trial court refused to include the language defining a "substantially handicapped person" as someone "regarded as having such an impairment" in the jury instructions. Plaintiff appealed from the adverse jury verdict. *Annear,* 454 N.W.2d at 874–75.

On appeal, we concluded the district court did not err in refusing to include the perceived disability alternative in its instructions to the jury. *Id.* at 875. We clarified the basis for our holding in *Annear* in *Howell* as follows:

> The situation to which *Annear* spoke was a disagreement between the employer and the employee as to whether a particular injury had healed sufficiently to enable the employee to return to work. *Annear* held that, if the employer makes an ad hoc decision based on circumstances relating to the particular injury, it may not be found guilty of disability discrimination simply because its decision was demonstrably wrong.

> We continue to agree with our *Annear* holding because the employer's decision in that case was based on an individualized assessment and in no way rested on myths, fears, or stereotypes, the situations at

which the perceived disability doctrine is aimed.

*Howell,* 585 N.W.2d at 281.

▇▇▇ Thus, from *Annear* and *Howell,* we can glean a standard for analyzing perceived disability claims. The plaintiff must establish that the defendant failed to make the employment decision based on an individualized assessment of the plaintiff's condition, and instead based its decision on myths, fears or stereotypes.

Applying this standard, we find substantial evidence supports the district court's conclusion that Four M did not regard Vincent as having an impairment that substantially limited him in the major life activity of working. Four M's decision not to rehire Vincent in January 1994 was based on an individualized assessment of Vincent's condition, following a conversation with his treating physician regarding the physical rigors of his job as machine tender. Moreover, evidence presented at trial supports the conclusion that Four M's decision regarding Vincent's work capability in January 1994 did not rest on myths, fears or stereotypes, the type of behavior forbidden under the perceived disability doctrine as defined in *Howell* and *Annear.* We affirm the district court's ruling on Vincent's perceived disability claim.

The district court properly concluded that Vincent failed to prove the first element of the three-part analysis for disability discrimination claims set forth in *Boelman,* that he either had a disability or Four M regarded him as having a disability. See *Boelman,* 522 N.W.2d at 79. Although the district court continued its analysis to address the other elements set forth in *Boelman,* we find it unnecessary to do so because Vincent's failure to prove the first element renders his claim insufficient to establish that Four M discriminated against him on the basis of a disability as prohibited by the ICRA.

C. Whether Four M Committed a Per Se ICRA Violation

▇▇▇ Vincent also contends that Four M's policy of requiring a medical release or that the employee be 100% healed before allowing the employee to return to work is a

per se violation of the ICRA. We will not consider this argument, however, because the record reflects that Vincent raised this issue for the first time in his brief before our court and has therefore failed to preserve the issue for review. We will not address an argument which the district court did not have an opportunity to consider. *See Sun Valley Iowa Lake Ass'n v. Anderson*, 551 N.W.2d 621, 642 (Iowa 1996).

We affirm the judgment of the district court.

**AFFIRMED.**