David **DOSE**, Plaintiff,

v.

**BUENA VISTA UNIVERSITY,**
Defendant.

**No. C01–4061–MWB.**

United States District Court,
N.D. Iowa,
Western Division.

Nov. 4, 2002.

---

Margaret M. Prahl, Heidman, Redmond, Fredregill, Patterson, Plaza, Dykstra & Prahl, Sioux City, IA, for Plaintiff.

Gary W Armstrong, Mack, Hansen, Gadd, Armstrong & Brown, PC, Storm

Lake, IA, Daniel Wilczek, Kristen M. Ludgate, Faegre & Benson, Minneapolis, MN, for Defendant.

**MEMORANDUM OPINION AND ORDER REGARDING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

BENNETT, Chief Judge.

## TABLE OF CONTENTS

I. *INTRODUCTION* ..................................................912
 A. *Procedural Background* ...............................912
 B. *Factual Background* ...................................913

II. *LEGAL ANALYSIS* .............................................918
 A. *Standards For Summary Judgment* ..............918
 1. *Requirements of Rule 56* .....................918
 2. *The parties' burdens* .........................919
 3. *Summary judgment in employment discrimination cases* ..............919
 B. *Elements Of An ADA Claim* ........................920
 C. *Dose's Claims Under The ADA* ....................921
 1. *Dose's actual disability claim* ...............921
 2. *Dose's claim for a record of disability* ....923
 3. *Dose's claim that he was regarded as disabled* .....................924
 D. *Nondiscriminatory Reason For Dose's Discharging* .....................926

III. *CONCLUSION* ...............................................926

## I. INTRODUCTION

### A. Procedural Background

On June 11, 2001, plaintiff David Dose filed a complaint against his former employer, defendant Buena Vista University ("BVU"), seeking damages resulting from the termination of his employment on July 19, 2000. In his complaint, Dose alleges claims of disability discrimination pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and similar claims under Iowa Code Chapter 216 *et seq.* Specifically, Dose asserts that he was discriminated against because: (1) he is disabled; (2) he has a record of being disabled; and, (3) he was regarded as being disabled by BVU. Defendant BVU answered Dose's complaint on July 6, 2001, denying Dose's claims and asserting various defenses.

On September 3, 2002, defendant BVU filed a motion for summary judgment on all of Dose's claims. First, defendant BVU asserts that Dose is not "disabled" within the meaning of either the ADA, or Chapter 216 of the Iowa Code. Specifically, defendant BVU asserts that Dose does not have a physical impairment that substantially limits one or more of his major life activities. Second, BVU claims that Dose has no record of a disability. Third, BVU asserts that Dose cannot establish that he was regarded as being disabled by BVU. Finally, BVU argues that it fired Dose because he made a threat against a BVU employee and not because of any alleged disability. BVU claims that Dose cannot demonstrate that its stated reason for terminating his employment was pretextual. On September 27, 2002, Dose resisted BVU's Motion for Summary Judgment, arguing that there are genuine issues of material fact in dispute regarding all of his claims. On October 15, 2002, BVU filed a reply brief in support of its summary judgment motion.

On October 29, 2002, the court heard telephonic oral arguments on BVU's Motion for Summary Judgment. Plaintiff

Dose was represented by Margaret M. Prahl of Heidman, Redmond, Fredrigill, Patterson, Plaza, Dykstra & Prahl, L.L.P., Sioux City, Iowa. Defendant BVU was represented by Daniel G. Wilzcek of Fagre & Benson, L.L.P., Minneapolis, Minnesota, and Gary W. Armstrong of Mack, Hansen, Gadd, Armstrong & Brown, P.C., Storm Lake, Iowa. Before discussing the standards for BVU's Motion for Summary Judgment, however, the court will first examine the factual background of this case.

### B. Factual Background

The summary judgment record reveals that the following facts are undisputed.

Plaintiff Dose was employed by BVU as a custodian. He began his employment with BVU in 1994. The custodian position responsibilities include mopping and scrubbing floors, stairs and other surfaces, using light and heavy floor machines, vacuuming carpeted areas, shampooing and extracting carpeted areas, cleaning lavatories, and moving furniture.

Dose was assigned to clean the library. Sylvia Reed was his immediate supervisor. Reed, in turn, reported to Rudy Fleege. Dose was required to clean stairs and restrooms using a mop and bucket. He also had to use a large carpet extractor and a large vacuum cleaner. In addition, he needed to use a large ladder to change light bulbs in the library's ceiling. All of the equipment weighs in excess of 30 pounds.

On January 31, 2000, Dose was admitted to St. John's Regional Medical Center for treatment of a blood clot condition, pulmonary embolism. Dose now takes a blood thinner to control the condition. Dr. Jonathan Hruska issued a work restriction that Dose could not lift more than 25 pounds or shovel snow for two weeks. BVU was informed of Dose's work restriction. On February 22, 2000, Dose returned to work with his temporary work restrictions. On February 29, 2000, Dr. Hruska revised his work restrictions for Dose by extending the snow shoveling ban for the remainder of the year.

On March 2, 2000, Dr. Hruska sent a letter to Amy Dettmer, BVU's Human Resources Manager. In the letter, Dr. Hruska recommended that Dose be restricted from lifting over 25 pounds and engaging "in repetitive activities such as bending and stooping (especially when associated with lifting.)." Defendant's App. at 93. Dr. Hruska further stated in the letter that the restrictions should be in place for six weeks and then re-evaluated. Dose continued to work with his temporary work restrictions. On April 6, 2000, Dr. Hruska provided, in a note, a revised work restriction for Dose. Dr. Hruska indicated that Dose should not lift more than 25 pounds but "may continue his usual duties." Defendant's App. at 94. Dr. Hruska further indicated in the note that the restrictions should be in place for six weeks and then re-evaluated. Dose continued to work with his temporary lifting restriction of 25 pounds.

On April 18, 2000, Dr. Hruska sent Dettmer another letter. In his letter, Dr. Hruska continued the restrictions set out in his April 6, 2000, note. Dr. Hruska did not place a time limit on the restrictions. On May 16, 2000, Dr. Jeffrey Sykes released Dose to work without any restrictions. While it was Dose's understanding that he was not to engage in strenuous activities which would risk injury to his leg or another blood clot, Dr. Sykes did not place any written work restrictions on Dose. Dose performed his normal job duties. Shortly after he was released without restrictions, Dose was instructed to push a wheeled mail cart full of graduation programs from the mail room to the chapel on the BVU campus, a distance of approximately one city block. Dose esti-

mates that the cart weighed more than 100 pounds. Dose did not attempt to move the cart. Dose did not think that he could push the cart without risking injury to his leg.

A meeting was held with Dose, Fleege, Dettmer, and Randy Flehr, BVU's Vice President of Business Services. Fleege and Dettmer expressed concern that Dose had refused to push the cart even though he had been released to work without restrictions. Dose stated that he did not feel that he could safely perform that task. It was suggested that they all call Dose's treating physician in order to determine his work restrictions. Dose agreed that it was a good idea to contact his physician. A telephone call to Dr. Sykes's office was made before the meeting adjourned. Dr. Sykes was unavailable but they spoke to his nurse. She stated that she would review the issue with Dr. Sykes. No new work restrictions for Dose were given at that time.

Another custodian pushed the cart for Dose. BVU always provided Dose with assistance. BVU never denied a request from Dose for assistance. On May 19, 2000, Dr. Jon Peacock, who worked with Dr. Sykes, sent a letter to BVU in which he again placed a work restriction on Dose. Dr. Peacock stated in his letter that Dose could "return to work with a weight restriction of 25 to 30 pounds for lifting, pulling, and pushing." Defendant's App. at 97. This was the first restriction regarding pushing and pulling. Dr. Peacock also indicated in his letter that the restrictions should be in place for four weeks. Dose had not seen or spoken to a doctor between the time that he had been released to resume work without restriction on May 16, 2000, and when Dr. Peacock issued his new work restriction on May 19, 2000.

Dose was off work from May 24, 2000, to May 30, 2000, so that he could visit the Mayo Clinic. The doctor who examined Dose at the Mayo Clinic did not change his work restrictions. The physician found that Dose was not incapacitated. "Incapacity" was defined as meaning an "inability to work, attend school or perform other regular activities due to the serious health condition, treatment therefor or recovery therefrom." Defendant's App. at 82.

On June 1, 2000, Dose returned to work and was told in a meeting with Dettmer that under BVU's new Custodial Department Policy on Limited or Restricted Duty he would not be permitted to work until he had work restrictions that allowed him to perform at least 75% of his job duties. Dose was told that he could use leave under the Family Medical Leave Act, available vacation or sick time, or apply for short term disability for the time missed.

Dettmer had earlier met with Dose's supervisor to determine what effect the work restriction had on Dose's ability to perform his duties. Reed stated that Dose's 25 to 30 pound restriction on pushing, pulling, or lifting would prevent Dose from performing many of his basic job duties because, among other things, the large vacuum cleaner used in the library, the mop bucket, the carpet extractor, moving furniture or a loaded trash barrel all would require Dose to push, pull, or lift more than 25 to 30 pounds. Reed concluded that Dose's work restriction would prevent him from performing significantly more than 25% of his duties.

BVU's restricted duty policy had been developed over a number of months beginning in the fall of 1999 or the spring of 2000. BVU previously had allowed people to work regardless of their work restrictions and the effect it had on their ability to do their job. BVU's prior policy caused concern within the custodial department about its ability to get the work done and

generated complaints by both supervisors and custodians.

On June 12, 2000, BVU received an incomplete Short Term Disability Claim Form regarding Dose. Dettmer sent the form back to Dose and indicated that the doctor needed to provide certain required information. The completed form was received on June 20, 2000. The completed application for short term disability benefits had a new restriction which provided Dose should not lift more than 50 pounds and that he should avoid strenuous activities.

On June 20, 2000, Dettmer faxed the custodial job description to the doctor to obtain clarity regarding the "strenuous activity" limitation. Dettmer asked the doctor to clarify what duties Dose could not do. An earlier version of the job description was sent to the doctor. On June 28, 2000, Dettmer received a letter from Dr. Sykes in which Dr. Sykes stated that Dose's only restriction was a fifty pound lifting restriction and that he could perform all the other duties on the job description. Upon receiving Dr. Sykes's clarification, Dettmer called Dose and he returned to work the following day.

The fifty pound weight restriction was issued after Dose met with a doctor for the first time after the May 16, 2000, restriction had been issued. Dose felt that the fifty pound weight restriction was a more accurate reflection of what he could do than the work restriction issued on May 16, 2000. Dose had disagreed with the 25–30 pound push, pull, or lift restriction and felt that it would be "okay" to push 25–30 pounds if it was on wheels. Dose was told by the doctor to "use [his] own judgment." Defendant's App. at 23. Dose had, since his first incident with blood clotting, been doing all his normal job duties except for those occasional duties that required heavy exertion such as moving furniture, shoveling snow, hauling furniture, tearing down dorm beds, "lugging" chairs from upper floors for special events, pushing heavy carts, ladder work, and pushing in bleachers.

Dose has testified that he is limited in his daily activities in that he was not able to play basketball with his kids or go dancing. He further testified, however, that his children are too old to play with him, his only grandchild is an infant, and that he had not been dancing for approximately three years. He is able to care for himself, walk, and engage in normal activities. Dose has also testified that he can not engage in activities that require heavy exertion such as laying cement or roofing as a result of damage to his lungs by blood clots, which makes it difficult to breathe while engaged in heavy exertion. Except when engaged in physically demanding activities, such as concrete work and roofing, Dose is able to breathe without difficulty. For example, he did not carry furniture up three flights of stairs to his son's new apartment but did make multiple trips carrying lighter boxes and "smaller stuff."

Dose was diagnosed with depression and took Zoloft for a period in May of 2000. He was taken off the medication that same month because he did not need it. He never told anyone at BVU about his depression diagnosis. Dose never thought that he was unable to do any type of activities because of mental or emotional problems.

On July 11, 2000, Dose and his wife, Donna, came to BVU's Human Resources Department to speak with Dettmer about the check he had received for disability benefits during his recent leave of absence. Nicole Fritz, a work study student, was also present. Dose told Dettmer that the disability check was inadequate and that he was experiencing financial difficulty because of his recent unpaid leave. Dettmer agreed to see what she could do to change

the eligibility date for the disability benefits to include his FMLA leave, which would result in a larger payment to Dose. The conversation then turned to Fleege. Dose told Dettmer that Fleege should wear a bullet proof vest. Dose understands that the statement was inappropriate and why people could be alarmed by it:

Q. [By Mr. Wilckek] I'm asking you what else you said.

A. [Plaintiff Dose] That's all I said.

Q. So it was in the context of Rudy's made a lot of people uncomfortable and he should where a bulletproof vest?

A. Correct.

Q. Why do people need bulletproof vests?

A. I don't know.

Q. People wear bulletproof vests to protect themselves; correct?

A. Correct.

Q. And protect themselves from being seriously injured if someone shoots them; correct?

A. Correct.

Q. So you were telling Amy that Rudy should wear a bullet proof vest?

A. Correct.

Q. And I take it that you would agree, looking back on it, that that was a very inappropriate thing to say?

A. Yes. Correct.

Q. And that you can understand why that statement would have alarmed Ms. Dettmer?

A. Correct.

Defendant's App. at 42–43. Dose does not believe that he was suffering from any mental or emotional difficulty at the time he made the statement regarding Fleege. Rather, Dose understood what he was saying and was cool, calm and collected when he made the statement regarding Fleege.

Dettmer notified her supervisor Fehr of Dose's statement regarding Fleege, which Dettmer viewed as a threat. At the time that Dettmer spoke with Flehr, she was visibly upset about Dose's statement. Fehr was concerned about the safety of Fleege, Dose and others on campus. Fehr contacted BVU's President, Frederick Moore, to discuss what they should do next. They decided to contact Mark Kirkholm, the Director of Campus Security at BVU and a former Storm Lake police officer, to have him investigate Dose's statement. Flehr and Moore had Kirkholm pulled out of a meeting he was attending to inform him of Dose's statement. Kirkholm was concerned about Dose's statement and felt that it should be taken seriously as a threat. The three determined that Kirkholm and BVU's campus counselor, Kelly Mattis, should meet with Dose to investigate his statement and, if necessary, take appropriate action to ensure the safety of Dose and BVU.

When Fleege was informed of Dose's statement he became concerned and viewed the statement as a threat. He took it seriously and viewed it as a realistic threat because the information came from Dettmer, a person he viewed as being very professional and who normally was calm and imperturbable.

Kirkholm met with Mattis and informed her of Dose's statement and requested her help in evaluating it. The two had worked previously together in crisis intervention situations and wanted to determine whether Dose had made the threat, whether he was serious about it, and whether he had the means to carry it out. Kirkholm and Mattis met with Dose in the student services conference room. Dose admitted that he made the statement about Fleege needing a bulletproof vest. Dose indicated that he viewed his statement as being the consensus of the custodial staff under Fleege's supervision. Dose indicated that he had firearms available at his home.

Kirkholm also observed that Dose appeared to be withdrawn.

Mattis and Kirkholm privately discussed the meeting they had with Dose. Both were concerned for the safety of BVU and felt that Dose and the community needed protection. They were concerned because Dose had admitted making the threat to Fleege, admitted that he viewed his statement as reflecting his views toward Fleege, and appeared to have the means to follow through with his threat. Both Mattis and Kirkholm agreed that BVU should contact the Judicial Hospitalization Referee for Buena Vista County, Hugh J. Perry, to inquire about whether involuntary commitment of Dose was appropriate under the circumstances.

Kirkholm had previously been a police officer for Storm Lake for nearly 21 years. In his position as a Storm Lake police officer, Kirkholm had contacted the Judicial Hospitalization Referee on several occasions to determine the appropriateness of involuntary commitment proceedings in situations where individuals had made threats against others or could be a danger to themselves or others. Mattis agreed that contacting the judicial referee was the appropriate course of action. Mattis was convinced from her observations that Dose needed to be evaluated for paranoia.

Kirkholm immediately called President Moore and Fehr regarding the meeting he and Mattis had just had with Dose. He informed them that Dose had confirmed making the bullet proof vest statement and Dose viewed his statement as reflecting his views toward Fleege. Kirkholm recommended seeking professional assistance by contacting the judicial mental health referee to determine whether involuntary commitment was appropriate under the circumstances. Fehr and Moore, who were concerned about the safety of Dose and BVU, directed Kirkholm to proceed. Kirkholm then called Hugh Perry, the Judicial Hospitalization Referee for Buena Vista County. Kirkholm informed Perry of the situation with Dose and asked him what he thought should be done. After Kirkholm and Fehr signed affidavits in support of the commitment application, Perry ordered the involuntary commitment of Dose.

Kirkholm met with Dose to explain that BVU had made an application to have him involuntarily committed, that the judicial referee had ordered his involuntary commitment, and that he would be taken into custody. Kirkholm told Dose he was going to the hospital because BVU did not know if he would harm himself or others.

Fehr and President Moore decided to terminate the employment of Dose because of his threat of violence against his supervisor. Fehr and Moore concluded that BVU could not tolerate employees making threats of violence to supervisors or other employees. BVU contacted Perry about the best approach for telling Dose of his discharge. Dose acknowledges that his statement regarding Fleege was inappropriate and is the reason given to him by BVU for his employment being terminated.

On July 12, 2000, Dose was transported to Spencer Municipal Hospital for an evaluation pending a commitment hearing. On July 14, 2000, a hearing was held to determine whether Dose should remain hospitalized. BVU did not participate in that hearing. A medical report from Dr. Matthews John was submitted at the hearing. Dr. John concluded that Dose had an adjustment disorder with disturbance of mood and conduct. Dr. John noted in the report his concern that Dose would harm himself or others if he did not receive treatment. Dose admits that if the police had not taken him to the hospital as ordered by the referee he would not have gone because he did not think it was nec-

essary. Dr. John advised Dose to remove all the firearms from his home. The Judicial Hospitalization Referee extended Dose's hospitalization "for such care and treatment as is deemed appropriate." Defendant's App. at 100. Dose was released from the hospital in Spencer on July 17, 2000.

To assist in his transition, BVU paid Dose severance equal to three months pay. Dose began work for Storm Lake Community Schools on August 25, 2000, less than one and one-half months after the termination of his employment at BVU. Before his discharge, Dose had been considering leaving BVU to find a way to improve himself. He was hoping to work full-time for the Storm Lake Community Schools. He drives a bus and performs occasional custodial duties. He has no work restriction from a doctor for his job with Storm Lake Community Schools, but avoids activity with high physical exertion such as shoveling snow and heavy lifting, pulling, or pushing. Dose is happy in his current position and has not sought another position. He has not missed any extended time from work due to illness or injury.

## II. LEGAL ANALYSIS

### A. Standards For Summary Judgment

This court has considered in some detail the standards applicable to motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure in a number of prior decisions. *See, e.g., Swanson v. Van Otterloo*, 993 F.Supp. 1224, 1230–31 (N.D.Iowa 1998); *Dirks v. J.C. Robinson Seed Co.*, 980 F.Supp. 1303, 1305–07 (N.D.Iowa 1997); *Laird v. Stilwill*, 969 F.Supp. 1167, 1172–74 (N.D.Iowa 1997); *Rural Water Sys. # 1 v. City of Sioux Ctr.*, 967 F.Supp. 1483, 1499–1501 (N.D.Iowa 1997), *aff'd in pertinent part*, 202 F.3d 1035 (8th Cir.), *cert. denied*, 531 U.S. 820, 121 S.Ct. 61, 148 L.Ed.2d 28 (2000); *Tralon Corp. v. Cedarapids, Inc.*,

966 F.Supp. 812, 817–18 (N.D.Iowa 1997), *aff'd*, 205 F.3d 1347, 2000 WL 84400 (8th Cir.2000) (Table op.); *Security State Bank v. Firstar Bank Milwaukee, N.A.*, 965 F.Supp. 1237, 1239–40 (N.D.Iowa 1997); *Lockhart v. Cedar Rapids Community Sch. Dist.*, 963 F.Supp. 805 (N.D.Iowa 1997). The essentials of these standards for present purposes are as follows.

### 1. Requirements of Rule 56

Rule 56 itself provides, in pertinent part, as follows:

Rule 56. Summary Judgment

(b) For Defending Party. A party against whom a claim ... is asserted ... may, at any time, move for summary judgment in the party's favor as to all or any part thereof.

(c) Motions and Proceedings Thereon.... *The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.*

FED. R. CIV. P. 56(a)-(c) (emphasis added). Applying these standards, the trial judge's function at the summary judgment stage of the proceedings is not to weigh the evidence and determine the truth of the matter, but to determine whether there are genuine issues for trial. *Quick v. Donaldson Co.*, 90 F.3d 1372, 1376–77 (8th Cir.1996); *Johnson v. Enron Corp.*, 906 F.2d 1234, 1237 (8th Cir.1990). An issue of material fact is genuine if it has a real basis in the record. *Hartnagel v. Norman*, 953 F.2d 394 (8th Cir.1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). As to whether a factual dispute is "material," the Supreme Court has explained, "Only dis-

putes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Rouse v. Benson,* 193 F.3d 936, 939 (8th Cir.1999); *Beyerbach v. Sears,* 49 F.3d 1324, 1326 (8th Cir.1995); *Hartnagel,* 953 F.2d at 394.

### 2. The parties' burdens

Procedurally, the moving party bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show lack of a genuine issue." *Hartnagel,* 953 F.2d at 395 (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)); *see also Rose–Maston,* 133 F.3d at 1107; *Reed v. Woodruff County, Ark.,* 7 F.3d 808, 810 (8th Cir.1993). "When a moving party has carried its burden under *Rule* 56(c), its opponent must do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348. Rather, the party opposing summary judgment is required under Rule 56(e) to go beyond the pleadings, and by affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548; *Rabushka ex. rel. United States v. Crane Co.,* 122 F.3d 559, 562 (8th Cir.1997), *cert. denied,* 523 U.S. 1040, 118 S.Ct. 1336, 140 L.Ed.2d 498 (1998); *McLaughlin v. Esselte Pendaflex Corp.,* 50 F.3d 507, 511 (8th Cir.1995); *Beyerbach,* 49 F.3d at 1325. If a party fails to make a sufficient showing of an essential element of a claim with respect to which that party has the burden of proof, then the opposing party is "entitled to judgment as a matter of law." *Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. 2548; *In re Temporomandibular Joint (TMJ) Im-*

*plants Prod. Liab. Litig.,* 113 F.3d 1484, 1492 (8th Cir.1997). In reviewing the record, the court must view all the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences that can be drawn from the facts. *See Matsushita Elec. Indus. Co.,* 475 U.S. at 587, 106 S.Ct. 1348; *Quick,* 90 F.3d at 1377 (same).

### 3. Summary judgment in employment discrimination cases

Because this is an employment discrimination case, it is well to remember that the Eighth Circuit Court of Appeals has cautioned that "summary judgment should seldom be used in employment-discrimination cases." *Crawford v. Runyon,* 37 F.3d 1338, 1341 (8th Cir.1994) (citing *Johnson v. Minnesota Historical Soc'y,* 931 F.2d 1239, 1244 (8th Cir.1991); *Hillebrand v. M–Tron Indus., Inc.,* 827 F.2d 363, 364 (8th Cir.1987), *cert. denied,* 488 U.S. 1004, 109 S.Ct. 782, 102 L.Ed.2d 774 (1989)); *see also Snow v. Ridgeview Medical Ctr.,* 128 F.3d 1201, 1205 (8th Cir.1997) (citing *Crawford*); *Helfter v. United Parcel Serv., Inc.,* 115 F.3d 613, 615 (8th Cir. 1997) (quoting *Crawford*); *Chock v. Northwest Airlines, Inc.,* 113 F.3d 861, 862 (8th Cir.1997) ("We must also keep in mind, as our court has previously cautioned, that summary judgment should be used sparingly in employment discrimination cases," citing *Crawford*); *Smith v. St. Louis Univ.,* 109 F.3d 1261, 1264 (8th Cir. 1997) (quoting *Crawford*); *Hardin v. Hussmann Corp.,* 45 F.3d 262 (8th Cir. 1995) ("summary judgments should only be used sparingly in employment discrimination cases," citing *Haglof v. Northwest Rehabilitation, Inc.,* 910 F.2d 492, 495 (8th Cir.1990); *Hillebrand,* 827 F.2d at 364). Summary judgment is appropriate in employment discrimination cases only in "those rare instances where there is no dispute of fact and where there exists only

one conclusion." *Johnson,* 931 F.2d at 1244; *see also Webb v. St. Louis Post–Dispatch,* 51 F.3d 147, 148 (8th Cir.1995) (quoting *Johnson,* 931 F.2d at 1244); *Crawford,* 37 F.3d at 1341 (quoting *Johnson,* 931 F.2d at 1244). To put it another way, "[b]ecause discrimination cases often depend on inferences rather than on direct evidence, summary judgment should not be granted unless the evidence could not support any reasonable inference for the nonmovant." *Crawford,* 37 F.3d at 1341 (holding that there was a genuine issue of material fact precluding summary judgment); *accord Snow,* 128 F.3d at 1205 ("Because discrimination cases often turn on inferences rather than on direct evidence, we are particularly deferential to the nonmovant," citing *Crawford* ); *Webb v. Garelick Mfg. Co.,* 94 F.3d 484, 486 (8th Cir.1996) (citing *Crawford,* 37 F.3d at 1341); *Wooten v. Farmland Foods,* 58 F.3d 382, 385 (8th Cir.1995) (quoting *Crawford,* 37 F.3d at 1341); *Johnson,* 931 F.2d at 1244.

However, the Eighth Circuit Court of Appeals also observed that, "[a]lthough summary judgment should be used sparingly in the context of employment discrimination cases, *Crawford v. Runyon,* 37 F.3d 1338, 1341 (8th Cir.1994), the plaintiff's evidence must go beyond the establishment of a prima facie case to support a reasonable inference regarding the alleged illicit reason for the defendant's action." *Landon v. Northwest Airlines, Inc.,* 72 F.3d 620, 624 (8th Cir.1995) (citing *Reich v. Hoy Shoe Co.,* 32 F.3d 361, 365 (8th Cir.1994)); *accord Kiel v. Select Artificials, Inc.,* 169 F.3d 1131, 1134 (8th Cir.) (observing that the burden-shifting frame-

work of *McDonnell Douglas* must be used to determine whether summary judgment is appropriate), *cert. denied,* 528 U.S. 818, 120 S.Ct. 59, 145 L.Ed.2d 51 (1999). In *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), the Supreme Court reiterated that " '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.' " *Reeves,* 530 U.S. at 142, 120 S.Ct. 2097 (quoting *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).[1] Thus, what the plaintiff's evidence must show, to avoid summary judgment or judgment as a matter of law, is " '1, that the stated reasons were not the real reasons for [the plaintiff's] discharge; and 2, that age [or race, or sex, or other prohibited] discrimination was the real reason for [the plaintiff's] discharge." *Id.* at 153 (quoting the district court's jury instructions as properly stating the law). The Supreme Court clarified in *Reeves* that, to meet this burden, "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, *may* permit the trier of fact to conclude that the employer unlawfully discriminated." *Id.* at 148 (emphasis added).

The court will apply these standards to defendant BVU's Motion for Summary Judgment.

### B. Elements Of An ADA Claim

■ This court has described the analytical framework for an ADA disability claim as follows:

---

**1.** In *Reeves,* the Supreme Court was considering a motion for judgment as a matter of law *after* a jury trial, but the Supreme Court also reiterated that "the standard for granting summary judgment 'mirrors' the standard for judgment as a matter of law, such that 'the inquiry under each is the same.' " *Reeves,*

530 U.S. at 150, 120 S.Ct. 2097 (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250–51, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Therefore, the standards articulated in *Reeves* are applicable to the present motion for summary judgment.

To qualify for relief under the ADA, a plaintiff must establish the following: (1) that he or she is a disabled person within the meaning of the ADA; (2) that he or she is qualified[;] that is, with or without reasonable accommodation (which the plaintiff must describe), he or she is able to perform the essential functions of the job; *and* (3) that the employer terminated the plaintiff, or subjected the employee to an adverse decision, "because of" the plaintiff's disability.

*Walsted v. Woodbury County*, 113 F.Supp.2d 1318, 1326 (N.D.Iowa 2000) (emphasis added); *see Cravens v. Blue Cross & Blue Shield of Kansas City*, 214 F.3d 1011, 1016 (8th Cir.2000).[2] "If a plaintiff in an ADA employment discrimination case can establish these three elements, then the burden shifts to the employer to proffer a legitimate, nondiscriminatory reason for the adverse employment action. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); (other citations omitted). Once such a reason is proffered, the burden shifts back to the plaintiff to show that the employer's stated reason is pre-textual." *Walsted*, 113 F.Supp.2d at 1326–27.

Under the ADA, a "disabled person" either (1) has a "physical or mental impairment that substantially limits one or more of the [person's] major life activities[,]" (2) has "a record of such an impairment," or (3) is "regarded as having such an impairment." 42 U.S.C. § 12102(2)(A), (B), (C). An employer is prohibited from discriminating against a qualified employee solely on the basis of a disability. 42 U.S.C. § 12112(a). The ADA defines discrimination to include the failure to make a reasonable accommodation to the known physical or mental limitations of an otherwise qualified employee with a disability, unless the accommodation would impose an undue hardship. 42 U.S.C. § 12112(b)(5)(A).

### C. Dose's Claims Under The ADA

#### 1. Dose's actual disability claim

Defendant BVU initially contends that Dose cannot establish a *prima facie* case of disability discrimination because he cannot demonstrate that he is disabled. Specifically, BVU asserts that Dose's physical

---

**2.** The court notes that in considering Dose's disability discrimination claims it will not distinguish between his claims under the ADA and comparable disability discrimination claims under the IRCA. This is appropriate because the Iowa Supreme Court has recognized that federal precedent is applicable to discrimination claims under the ICRA. *See Fuller v. Iowa Dep't of Human Servs.*, 576 N.W.2d 324, 329 (Iowa 1998) (recognizing that Chapter 216's prohibition on disability discrimination is the state-law "counterpart" to the ADA, and that, "[i]n considering a disability discrimination claim brought under Iowa Code chapter 216, we look to the ADA and cases interpreting its language. We also consider the underlying federal regulations established by the Equal Employment Opportunity Commission (hereinafter 'EEOC'), the agency responsible for enforcing the ADA.") (internal citations omitted); *cf. Vivian v. Mad-*

*ison*, 601 N.W.2d 872, 873 (Iowa 1999) ("The ICRA was modeled after Title VII of the United States Civil Rights Act"). Iowa courts, therefore, traditionally turn to federal law for guidance in evaluating the ICRA. *King v. Iowa Civil Rights Comm'n*, 334 N.W.2d 598, 601 (Iowa 1983). While federal law is not controlling and courts should not substitute the language of the federal statutes for the clear words of the ICRA, Iowa courts do look to the analytical framework utilized by the federal courts in assessing federal law. *Hulme v. Barrett*, 449 N.W.2d 629, 631 (Iowa 1989); *accord Board of Supervisors of Buchanan County v. Iowa Civil Rights Comm'n*, 584 N.W.2d 252, 256 (Iowa 1998) ("In deciding gender discrimination disputes, we adhere to the Title VII analytical framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668, 677–79 (1973).").

impairments do not substantially limit any major life activity. Thus, in considering whether Dose can make out a *prima facie* case of discrimination under the ADA, the court must first determine whether Dose is "disabled" as defined by the ADA; that is, whether he has a physical or mental impairment that substantially limits one or more of his major life activities. 42 U.S.C. § 12102(2)(A); *see Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 481, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999) (requiring that a person be presently—not potentially or hypothetically—substantially limited in order to demonstrate a disability). "Merely having an impairment does not make one disabled for purposes of the ADA. Claimants also need to demonstrate that the impairment limits a major life activity." *Toyota Motor Mfg. Ky., Inc. v. Williams*, 534 U.S. 184, ——, 122 S.Ct. 681, 690, 151 L.Ed.2d 615 (2002).

Dose asserts in his brief that his physical impairments substantially limit him in the major life activity of breathing. Defendant BVU does not contest, nor can it, that breathing is a major life activity. *See Amir v. St. Louis Univ.*, 184 F.3d 1017, 1027 (8th Cir.1999) ("Major life activities do include functions such as 'caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.'") (quoting 28 C.F.R. § 36.104); *Land v. Baptist Med. Ctr.*, 164 F.3d 423, 424 (8th Cir.1999) (holding that breathing is a major life activity within the contemplation of the ADA); *see also E.E.O.C. v. United Parcel Serv., Inc.*, 249 F.3d 557, 562 (6th Cir.2001) ("A person is 'disabled' under the Act if his or her physical or mental impairment substantially limits one or more life activities, including breathing and self-care."), *cert. denied*, —— U.S. ——, 122 S.Ct. 1203, 152 L.Ed.2d 141 (2002); *Doyal v. Oklahoma Heart, Inc.*, 213 F.3d 492, 495–96 (10th Cir.2000) ("Major life activities include such functions as caring for oneself, per-

forming manual tasks, walking, seeing, hearing, speaking, breathing, learning, sleeping, sitting, standing, lifting, reaching, and working."); *Homeyer v. Stanley Tulchin Assoc., Inc.*, 91 F.3d 959, 961 (7th Cir.1996) (holding that plaintiff's claim that she was "disabled" because her major life activity of breathing was substantially limited by her respiratory condition would provide a basis for protection under the ADA). Rather, the critical question before the court is whether Dose's blood clotting condition substantially limits his ability to breathe.

■ The Eighth Circuit Court of Appeals had instructed that:

A major life activity is substantially limited if an individual is unable to "perform a basic function that the average person in the general population can perform" or is significantly restricted in "the condition, manner, or duration under which [she] can perform a particular major life activity as compared to an average person in the general population." *Snow v. Ridgeview Med. Ctr.*, 128 F.3d 1201, 1206 (8th Cir.1997); *see* 29 C.F.R. § 1630.2(j)(1) (1998). Whether a major life activity is substantially limited is an individualized and fact-specific inquiry. *See Colwell v. Suffolk County Police Dep't*, 158 F.3d 635, 643 (2d Cir. 1998).

*Land*, 164 F.3d at 424–25. Here, the court concludes that there is no genuine issue of fact that Dose generally is able to perform the basic function of breathing. Dose's physical impairment only arises when he engages in activities that require heavy exertion. Dose can engage in all of his normal activities. He is only restricted from engaging in such activities as moving furniture, carrying heavy loads, roofing, playing baseball, running or dancing. *See Muller v. Costello*, 187 F.3d 298, 314 (2d Cir.1999) (overturning a jury verdict under

the ADA because proof of plaintiff's breathing impairment must be evaluated with reference to corrective measures and there was insufficient evidence of breathing difficulty outside of work). Thus, if Dose avoids activities that require heavy exertion, his physical infirmity does not substantially limit his ability to breathe within the definition of disability under the ADA. *See Land,* 164 F.3d 423, 425 (8th Cir.1999) (holding that plaintiff's severe allergic reactions to peanut-laden foods did not substantially limit major life activity of breathing because her ability to breath was otherwise "generally unrestricted"); *Zirpel v. Toshiba Am. Information Sys., Inc.,* 111 F.3d 80, 81 (8th Cir.1997) (holding that although breathing was hampered during actual panic attack, disorder did not substantially limit plaintiff's major life activities where attacks were infrequent and very manageable); *Robinson v. Global Marine Drilling Co.,* 101 F.3d 35, 37 (5th Cir.1996) (holding that several instances of asbestosis-related shortness of breath did not substantially limit major life activity of breathing). The court concludes that while Dose's blood clotting condition can have an effect upon his breathing, his condition does not substantially or materially effect the major life activity of breathing. Therefore, defendant BVU's motion for summary judgment is granted as to Dose's claim of discrimination based on an actual disability.

### 2. *Dose's claim for a record of disability*

■ Defendant BVU next argues that Dose does not have a record of impairment sufficient to qualify him as disabled for the purposes of the ADA. "The ADA does proscribe discrimination based upon a documented history of having a physical or mental impairment that substantially limits one or more of the major life activities." *Weber v. Strippit, Inc.,* 186 F.3d 907, 915 (8th Cir.1999), *cert. denied,* 528 U.S. 1078,

120 S.Ct. 794, 145 L.Ed.2d 670 (2000). The Eighth Circuit Court of Appeals has held that, "[i]n order to have a record of disability under the ADA, a plaintiff's medical documentation must show that [s]he has a history of, or has been misclassified as having, a physical or mental impairment that substantially limits one or more major life activities." *Weber,* 186 F.3d at 915; *see Taylor v. Nimock's Oil Co.,* 214 F.3d 957, 961 (8th Cir.2000). While Dose's blood clotting condition is "evidence of a history of an impairment, [it is] not evidence of a history of a disability." *Land,* 164 F.3d at 425 (concluding plaintiff's allergy did not substantially limit her ability to eat or breathe—major life activities) (quoting *Robinson v. Global Marine Drilling Co.,* 101 F.3d 35, 37 (5th Cir.1996)); *see also Taylor,* 214 F.3d at 958–59 (stressing that an ADA claimant must present "documentation" to show a record of disability and declaring, "We do not believe that [defendant's] mere knowledge of [plaintiff's] heart attack, coupled with the sending of a get-well card and a note about her job duties, constitutes sufficient documentation that [plaintiff] had a history of disability or that [defendant] misclassified her as disabled within the meaning of the ADA."); *Gutridge v. Clure,* 153 F.3d 898, 901 (8th Cir.1998) (rejecting argument that simply being hospitalized establishes a record of disability under the ADA). Here, because the court has found that Dose has never had an impairment that substantially limited him in a major life activity, it logically follows, and the court so finds, that he has no history or record of such a disability upon which to base a claim under the ADA. Therefore, the court concludes that BVU is entitled to summary judgment on Dose's claim that he was discriminated against based upon a record of having a disability. The court turns next to an analysis of Dose's claim that he was dis-

criminated against because he was regarded as suffering from a disability.

### 3. Dose's claim that he was regarded as disabled

■ Plaintiff Dose also alleges a claim, under 42 U.S.C. § 12102(2)(C), that BVU regarded him as disabled. The Supreme Court has interpreted this section of the ADA as follows:

There are two apparent ways in which individuals may fall within this statutory definition: (1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities. In both cases, it is necessary that a covered entity entertain misperceptions about the individual—it must believe either that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting.

*Sutton v. United Air Lines*, 527 U.S. 471, 489, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999); *see Conant v. City of Hibbing*, 271 F.3d 782, 784 (8th Cir.2001) (citing *Sutton*, 527 U.S. at 489, 119 S.Ct. 2139). The Eighth Circuit Court of Appeals has observed that it is not a question of whether the defendants treated the plaintiff adversely "because of his or her feelings about the plaintiff's physical or mental impairment," *Weber*, 186 F.3d at 915, but a question of whether the defendants' treatment of the plaintiff was a result of the defendants' harboring " 'archaic attitudes,' erroneous perceptions, and myths that work to the disadvantage of persons with or regarded as having disabilities." *Brunko v. Mercy Hosp.*, 260 F.3d 939, 942 (8th Cir.2001). Consequently, the analysis is the same under both the actually disabled and regarded as disabled claims. *Kellogg*

*v. Union Pac. R. Co.*, 233 F.3d 1083, 1089 (8th Cir.2000) ("Thus, our analysis is the same as under an actually disabled claim, but the question here is whether Union Pacific regarded Kellogg as precluded from more than a particular job.") (citing *Murphy*, 527 U.S. at 521–22, 119 S.Ct. 2133; *Sutton*, 527 U.S. at 491–92, 119 S.Ct. 2139). To prove a "regarded as" disability within the meaning of the ADA, the plaintiff must demonstrate the defendant entertains misperceptions about him—that the defendant believes the plaintiff has either "a substantially limiting impairment" that he does not have, or "a substantially limiting impairment when, in fact, the impairment is not so limiting." *Sutton*, 527 U.S. at 488–89, 119 S.Ct. 2139; *Conant*, 271 F.3d at 784–85. To establish a "regarded as" claim under the ADA, a plaintiff must show that the defendant "perceived him as actually disabled." *Kellogg*, 233 F.3d at 1089 (citing *Murphy v. United Parcel Service, Inc.*, 527 U.S. 516, 521–22, 119 S.Ct. 2133, 144 L.Ed.2d 484 (1999) and 29 C.F.R. § 1630.2(*l*)(1)). The test for perceived disability is not "whether defendant treated plaintiff adversely because of his or her feelings about the plaintiff's physical or mental impairment.... Rather, the test is whether defendant treated plaintiff adversely because it regarded him as having an impairment that substantially limits one or more major life activities." *Weber*, 186 F.3d at 915 (internal citations omitted). "An employer's knowledge of an employee's disability, without more, is not sufficient to establish a 'regarded as' claim." *Kellogg*, 233 F.3d at 1089; *accord Conant*, 271 F.3d at 786 (The mere fact that a defendant is aware of a plaintiff's past medical condition and might perceive that the plaintiff still has the medical condition or is likely to develop a medical condition in the future is insufficient to prove a "regarded as" claim) (citing *Kellogg*, 233 F.3d at 1089 and *Aucutt v. Six Flags Over Mid-America, Inc.*, 85 F.3d 1311, 1320

(8th Cir.1996)); *Taylor*, 214 F.3d at 961 (concluding that an employer's knowledge of an employee's medical difficulties and expression of concern does not amount to treating an employee as if he had a permanent disability that substantially limits his life activities).

Here, Dose argues that he was treated as having a substantially limiting· impairment·when he was restricted from working under BVU's 75% policy. Dose does not otherwise explain how BVU regarded him as being disabled. To be regarded as substantially limited in the life activity of working, a plaintiff must be regarded as "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." *Cooper*, 246 F.3d at 1089 (citing *Murphy*, 527 U.S. at 523 and 524, 119 S.Ct. 2133 29 C.F.R. § 1630.2(j)(3)(i)). Inability to perform one particular job does not constitute a substantial limitation on working. *Id.* A plaintiff must show that because of his impairment he has suffered a significant reduction in meaningful employment opportunities. *Id* (citing *Webb v. Garelick Mfg. Co.*, 94 F.3d 484, 488 (8th Cir.1996)). Factors to be considered in determining whether a plaintiff is restricted from a class of jobs include his expertise, background, and job expectations. *Id.* (citing *Taylor*, 214 F.3d at 960–61 29 C.F.R. § 1630.2(j)(3)(ii)).

■ The court finds that, even when the record is given the most liberal reading in Dose's favor, the record does not establish that BVU perceived Dose as having an impairment that significantly restricted his ability to work. The record shows on May 16, 2000, Dose was released to work without restrictions. BVU considered Dose fit enough to push a wheeled mail cart filled with graduation programs from the mail room to the chapel on BVU's campus. After Dose refused to push the cart because of safety concerns and his doctor was contacted, he was given a work restriction that he should not lift, push or pull more than 25 to 30 pounds. BVU believed that Dose's 25 to 30 pound restriction on pushing, pulling, or lifting would prevent Dose from performing many of his basic job duties because, among other things, the large vacuum cleaner used in the library, the mop bucket, the carpet extractor, moving furniture or a loaded trash barrel all would require Dose to push, pull, or lift more than 25 to 30 pounds. It was only after BVU concluded that Dose's work restriction would prevent him from performing significantly more than 25% of his duties that he was placed on leave. Once Dose's work restriction was modified, he was allowed to return to work. This demonstrates that BVU was not acting on erroneous perceptions of Dose's ability to work but was taking action only in response to a newly imposed work restriction under which BVU believed Dose was unable to perform 75% of the duties required for the position of custodian. As a result, the court concludes that Dose's regarded as disabled claim fails because he has not generated a genuine issue of material fact that BVU perceived him as having an impairment that significantly restricted his ability to perform any major life activities. *See Murphy*, 527 U.S. at 524, 119 S.Ct. 2133 (concluding summary judgment is proper where ADA plaintiff fails to show that he is "regarded as unable to perform a class of jobs"). Therefore, the court concludes that BVU is entitled to summary judgment on Dose's· claim that he was discriminated against because he was regarded as being disabled.[3]

---

3. Because, as discussed above, the court has found that Dose was not disabled, the court concludes that he does not have standing to challenge BVU's restricted duty policy. *See Hutchinson v. United Parcel Serv.*, 883

### D. Nondiscriminatory Reason For Dose's Discharging

 Even if the court were to assume, *arguendo*, that Dose has made out a *prima facie* case, summary judgment is appropriate here because BVU had a legitimate nondiscriminatory reason for terminating Dose's employment, his threat toward his supervisor, Fleege. Violence or a threat of violence against co-employees constitute legitimate reasons for terminating an employee. *See Sherman v. Runyon*, 235 F.3d 406, 409 (8th Cir.2000) (" 'Both actual violence against fellow employees and threats of violence are legitimate reasons for terminating an employee.' ") (quoting *Clark v. Runyon*, 218 F.3d 915, 919 (8th Cir.2000)); *Ward v. Procter & Gamble Paper Prods., Co.*, 111 F.3d 558, 560 (8th Cir.1997) ("It is beyond question that an employee's striking of a fellow employee is a legitimate, nondiscriminatory reason for dismissal."); *see also Chatfield v. Shilling Constr. Co.*, 232 F.3d 900, 2000 WL 1531846, *2 (10th Cir. Oct. 17, 2000) (holding that employee's threats of violence against a coworker were legitimate, nondiscriminatory reasons for termination) (unpublished table decision); *Jones v. American Postal Workers Union Nat'l*, 192 F.3d 417, 429 (4th Cir.1999) (holding that employer was entitled to discharge employee after he threatened life of his supervisor even if such misconduct was caused by employee's disability); *cf. Phillips v. Union Pac. R.R.*, 216 F.3d 703, 706 (8th Cir.2000) (holding in context of Title VII race discrimination claim that threatening a coworker with bodily harm was nondiscriminatory reason for suspension). While Dose asserts that he did not mean his statement to be a threat, the pretext

inquiry concerns itself with whether the employer's stated reasons for termination were in fact the actual reasons for the action taken and, on that question, Dose has failed to generate a genuine issue of material fact that the reason offered here by BVU was false. Therefore, the court alternatively finds that BVU is entitled to summary judgment on Dose's discrimination claims at the third stage of *McDonnell Douglas* because BVU had a legitimate nondiscriminatory reason for terminating Dose's employment.

### III. CONCLUSION

Initially, because the court concludes that Dose has not generated a genuine issue of material fact as to whether he suffers from a qualifying disability within the meaning of the ADA and the ICRA, the court grants BVU's Motion For Summary Judgment on Dose's claim that he was discriminated against because of an actual disability. The court also concludes that Dose has not generated a genuine issue of material fact that he had a record of a qualifying disability, and grants BVU's Motion For Summary Judgment on this claim. In addition, the court concludes that Dose has not generated a genuine issue of material fact that BVU regarded him as disabled. Therefore, the court grants BVU's Motion For Summary Judgment on Dose's claim that BVU discriminated against him because it regarded him as disabled. Alternatively, the court concludes that Dose has not generated a genuine issue of material fact that BVU's legitimate nondiscriminatory reason for terminating Dose's employment, his threat toward his supervisor, was a pretext

---

F.Supp. 379, 396 (N.D.Iowa 1995) (holding that plaintiff lacking standing to challenge employer's policy that an employee had to be "100% healed" before being permitted to return to work where plaintiff could not gain any relief from the *per se* violation of the ADA

because the plaintiff was not a qualified individual with a disability). Therefore, the court grants BVU's motion for summary judgment as to Dose's claim that application of BVU's restricted duty policy was a *per se* violation of the ADA.

for his discharge. Therefore, BVU's Motion For Summary Judgment is granted as to all of Dose's claims that he was discharged in violation of the ADA and the ICRA.

**IT IS SO ORDERED.**